IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK CHASE,

*Plaintiff*,

v.

TOWN OF OCEAN CITY,

*Defendant*.

Civil Action No. ELH-11-1771

## MEMORANDUM OPINION

Mark Chase, plaintiff, a self-described "spray paint can artist," is a visual artist whose medium is quick-drying, gloss-based enamel spray paint. Chase is also a street performer; he creates his paintings in the open air before a live audience. During the spring and summer months, Chase creates his paintings on or about the boardwalk in the resort venue of Ocean City, Maryland, where he sells his paintings to the public.

On June 28, 2011, plaintiff filed suit (ECF 1), against the Town of Ocean City, Maryland ("Ocean City" or the "City"), defendant, alleging that various town ordinances violate his right to free expression, guaranteed by the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. The ordinances at issue impose several restrictions on the activities of "peddling, soliciting, hawking or street performing" on the boardwalk, prohibit all sales on and near the boardwalk, and establish registration requirements. Plaintiff seeks a declaratory judgment, preliminary and permanent injunctive relief, compensatory and punitive damages, and an award of attorneys' fees and costs. *See* Complaint at 12-13 (ECF 1).

Presently before the Court is plaintiff's Motion for Preliminary Injunction ("Motion") (ECF 2). After the parties submitted memoranda of law and documentary exhibits, *see*

Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Mem.") (ECF 2-4); Defendant's Response to Plaintiff's Motion for Preliminary Injunction & Memorandum in Support of Response ("Opp.") (ECF 5), the Court held an evidentiary hearing on August 23, 2011. Testimony was presented by the plaintiff, as well as three Ocean City officials: Richard W. Meehan, the Mayor of Ocean City; Ocean City Fire Chief Chris Larmore; and Corporal Richard Wawrzeniak of the Ocean City Police Department. Several exhibits were also introduced into evidence.[1] For the reasons that follow, I will grant plaintiff's Motion in part and deny it in part, and will preliminarily enjoin certain aspects of the disputed statutory scheme.

## Background[2]

### A.  Ocean City and Its Boardwalk

Ocean City, Maryland, is a seaside community located on Maryland's Eastern Shore. Situated on a long, narrow spit of land, the City runs north-south along the Atlantic Ocean. It extends for several miles along the coast (*i.e.* north-south), but is only a few city blocks wide (*i.e.* east-west), even at its widest point.

The City is one of Maryland's major summer vacation destinations. According to Mayor Meehan, Ocean City receives around four million visitors every year between mid-May and mid-

---

[1]  "Before or after beginning the hearing on a motion for a preliminary injunction," Rule 65(a)(2) of the Federal Rules of Civil Procedure permits a court to "advance the trial on the merits and consolidate it with the hearing," although the court must "preserve any party's right to a jury trial." At the preliminary injunction hearing, the parties indicated that they did not want to proceed immediately to a trial on the merits.

[2]  The facts are gleaned from the parties' exhibits and the testimony. In addition, I take judicial notice of some basic geographic information that is widely known within Maryland. *See, e.g.*, *United States v. Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984) (geographical information that is "'generally known within the territorial jurisdiction of the trial court'" is "especially appropriate for judicial notice") (citations omitted); *Davenport v. City of Alexandria*, 710 F.2d 148, 151 (4th Cir. 1983) (same).

September, and receives another four million visitors during the remaining portion of the year. July and August are the peak months for summer tourism.

The City's easternmost platted street is Atlantic Avenue, which is also known as the boardwalk. The boardwalk is a wooden pedestrian walkway that is located between the ocean beach and the paved streets of Ocean City. It is approximately three miles long, running from South Second Street in the south to about 22nd Street in the north, and between 50 and 75 feet wide. The boardwalk is lined with shops and other attractions for pedestrians.

Although the boardwalk is primarily used only by pedestrians, the City operates a "tram" as a means of public transportation along the boardwalk. Corporal Wawrzeniak described the tram, a wheeled motor vehicle that transports passengers, as being slightly wider than a minivan, and composed of a front vehicle, operated by a driver, towing several trailers, each of which has 10-15 rows of passenger seating. At the southern end of the boardwalk, from South Second Street to Fourth Street, there is a concrete roadway next to the boardwalk, between the boardwalk and the beach, on which the tram operates. North of Fourth Street, the tram runs on the boardwalk.[3]

There are no restrictions on pedestrian access to the boardwalk. Moreover, there is no admission charge or identification requirement for entry on the boardwalk (or the beach), nor is there any restriction on the number of people who can be on the boardwalk at any given time. In the evenings during the peak months of summer, the boardwalk is highly congested, with

---

[3] Corporal Wawrzeniak testified that the concrete roadway is part of the "boardwalk." Chase differentiated between the concrete roadway and the boardwalk. However, there does not seem to be a dispute that the concrete roadway is considered part of the "boardwalk," as that term is used in the City ordinances at issue in this case.

pedestrians walking along and flocking to the many shops, eateries, and attractions that the boardwalk has to offer. In the day, the boardwalk is a point of access to the beach.

Although the tourist traffic on the boardwalk creates challenges for crowd control, it is very desirable to Ocean City. In Mayor Meehan's words, crowds are "what we want."

Street performers are among the boardwalk's many attractions. Indeed, Mayor Meehan acknowledged that street performers are part of the "experience" that draws visitors to the boardwalk. By Mayor Meehan's estimate, on a clear summer night, as many as 25 to 40 street performers could be performing at various locations along the boardwalk. The parties submitted photographs depicting a variety of street performers, including plaintiff; other painters, caricaturists, and visual artists; magicians and clowns; musicians; and performers in costume portraying pop culture characters such as Spongebob Squarepants and Spiderman.

The crowds that street performers draw on the boardwalk vary considerably, but are significantly larger at night. Corporal Wawrzeniak testified that, on occasion, some performers have drawn "hundreds" of spectators for night performances. According to Corporal Wawrzeniak, the most significant challenge law enforcement encounters with regard to street performers is management of the crowds they attract, so as to ensure safe passage of the public along the boardwalk and unimpeded emergency access to the boardwalk. Because the boardwalk is highly congested, Corporal Wawrzeniak indicated that each performer's ability to manage his or her own crowd is "paramount."

B. The Ordinances

At issue in this case are several ordinances enacted by Ocean City that impose regulations that apply to the boardwalk, *see* Code of the Town of Ocean City ("City Code"), ch. 62, art. I

(1999, Supp. No. 18, May 16, 2011) (available at http://oceancitymd.gov/City_Clerk/ City_Code/), and its registration requirements for "unlicensed solicitors."  *See id.* §§ 62-1, 62-3, 6-7.[4]

In brief, the regulations applicable to the boardwalk fall into three categories.  First, there is a categorical limitation on commercial activity that applies to the entire boardwalk, as well as public streets within 75 feet of the boardwalk and certain additional areas.  *See id.* § 62-4.  Second, an ordinance limits the locations on the boardwalk where a person can engage in "peddling, soliciting, hawking or street performing." *Id.* § 62-5(b)(1) (as amended by Ordinance 2011-23, adopted June 20, 2011).  Third, there are restrictions as to the manner in which a person may engage in "peddling, soliciting, hawking or street performing." *See id.* § 62-5(b)(2)-(12).  I shall review each of these categories in more detail.

*1.  Limitation on Commercial Activity*

The categorical limitation on commercial activity throughout the boardwalk is set forth in City Code, § 62-4.  With exceptions not relevant here, it provides:

**Sec. 62-4. — Limitations on commerce on the boardwalk and immediately adjoining public areas.**

It shall be unlawful for any person upon the boardwalk or upon its benches, ramps, stairs and other fixtures or upon the Caroline Street pad, or other

---

[4]  In his Complaint and in his Motion, plaintiff also challenged Ocean City's general business licensing scheme, codified in Chapter 14, Article II, of the City Code.  However, the City represented in its opposition to plaintiff's Motion that plaintiff is subject only to the "unlicensed solicitor" registration scheme, and not the business licensing provisions of Chapter 14. *See* Opp. at 2-3.  Plaintiff has not subsequently contested the City's assertion that he is not subject to the general licensing provisions.  Moreover, no evidence or argument regarding Chapter 14 was presented at the hearing.  Accordingly, I consider plaintiff's request for a preliminary injunction as to Chapter 14 to be waived, without prejudice to his request for final relief on the merits as to those code provisions.  Nevertheless, I will discuss the requirements of Chapter 14, *infra*, for context.

street-end pads adjoining the boardwalk, or upon any other publicly owned surface or street situated within 75 feet of the edge of the boardwalk, or upon [two specified city blocks] to engage in the public sale, rental or exchange for a donation of any goods, wares, merchandise, foodstuffs, refreshments or other commodities or services.[5]

### 2. Limitation on Location of Peddling, Soliciting, Hawking, and Street Performing

The limitation on the locations in which a person may engage in peddling, soliciting, hawking, or street performing is found in City Code, § 62-5(b)(1), as part of a larger list captioned "Prohibited acts on the boardwalk." It states:

**Sec. 62-5. — Prohibited acts on the boardwalk.**

\* \* \*

(b)     It shall be unlawful for any person engaging in the permitted activity of peddling, soliciting, hawking or street performing[6] on the boardwalk to:

(1)     Exercise or perform such activity or display in any area of the boardwalk other than within the area encompassed in the extended boundaries of the street ends[, except for the area encompassed within the extended boundaries from the south side of the boardwalk ramp on the south side of N. Division Street to the north side of the boardwalk ramp on the north side of N. Division Street, where such activity is also prohibited].

*Id.* (brackets indicate language added by Ordinance 2011-23, adopted June 20, 2011).

Although the ordinance does not define the phrase "extended boundaries of the street ends," the parties have agreed on its meaning. As Corporal Wawrzeniak explained at the hearing, many of the City's east-west streets terminate or "end" at the western edge of the

---

[5] Another section of the City Code, § 62-2, entitled "[l]imitations on commerce on the boardwalk," provides a more limited restriction, stating that it is "unlawful for any person, upon the boardwalk or upon its benches, stairs and other fixtures, to engage in the public sale, rental or exchange for donation of any goods, wares, merchandise, foodstuffs, refreshments or other commodities or services." Section 62-4 seemingly applies everywhere that § 62-2 applies, making § 62-2 redundant and entirely subsumed within the prohibition contained in § 62-4.

[6] The City Code does not contain definitions of the terms "hawking," "soliciting," "peddling," or "street performing."

boardwalk. The "area encompassed in the extended boundary" of a given "street end" refers to the portion of the boardwalk at the boardwalk's intersection with an east-west street. It is delineated by the east and west edges of the boardwalk, and by invisible lines extending across the boardwalk, as a continuation of the northern and southern edges of the east-west street.

Section 62-5(a) of the Code articulates the basis for § 62-5(b)(1)'s limitation on the location where peddling, soliciting, hawking or street performing can occur. It provides that the "Mayor and City Council . . . determined that the boardwalk is a major tourist attraction with congregations of pedestrians and the boardwalk tram necessitating the regulation of the location" of peddling, hawking, soliciting, and street performing "for public safety purposes." City Code, § 62-5(a). Further, the Mayor and City Council "determined that the best interest of the public health, safety and general welfare is best served by limiting such activities to the area within the extended boundaries of street ends." *Id.*

As indicated, the bracketed text in the above quotation from City Code, § 62-5(b)(1) was added by a recent amendment to the Code. Ocean City Ordinance 2011-23, which excluded the area encompassed by the extended boundaries of North Division Street from the street end areas where peddling, hawking, soliciting, and street performing are allowed, was enacted on June 20, 2011, a few days before this lawsuit was filed. At the preliminary injunction hearing, both Mayor Meehan and Fire Chief Larmore testified that the North Division Street restriction was enacted for public safety reasons, to ensure emergency access to the boardwalk for the Fire Department's vehicles and equipment, including fire trucks and ambulances.[7]

---

[7] Chief Larmore also submitted an affidavit to similar effect. *See* Ex.2 to Opp. ("Larmore Aff.") (ECF 5-2).

North Division Street is the terminus of US Route 50, also known as Ocean Gateway, which is the main thoroughfare into Ocean City. Chief Larmore, who has been a member of the Ocean City Fire Department for twenty years, claimed that North Division Street has been the Department's primary emergency access route to the boardwalk for as long as he can remember. *See* Larmore Aff. ¶¶ 4-12. He explained that the end of North Division Street is the widest of any of the street ends abutting the boardwalk, and is almost twice as wide as any other street end. Moreover, unlike many of the other street ends, it is not obstructed by features such as wooden benches. According to Chief Larmore, it is the only street end that can accommodate the Fire Department's largest vehicles, and is the primary and most efficient means of ingress and egress to the boardwalk and beach for first responders to any fire or medical emergency occurring south of North Division Street.

Chief Larmore recalled that, in the past ten years, there have been four significant fires in structures on or near the boardwalk south of North Division Street, two north of North Division Street, and countless medical emergencies, all of which have required the Department to access the boardwalk via North Division Street. In his affidavit, Larmore averred that he is personally aware of incidents in which emergency personnel's ingress and egress to the boardwalk at North Division Street has been hindered due to the presence of street performers on or around the ramps leading onto the boardwalk at the end of North Division Street. *See* Larmore Aff. ¶ 13. In Chief Larmore's view, the difficulty with street performers in that location is not the performers themselves, but the crowds they draw, because it is more difficult to disperse a gathered, stationary crowd than to clear a path through a moving crowd.

According to Chief Larmore, at a meeting of Ocean City's department heads in June 2011, the City Manager indicated that an issue regarding street performers would be brought before the City Council at an upcoming council meeting, and asked department heads with concerns or questions regarding the issue of street performers on the boardwalk to attend the meeting. Larmore testified that, at the council meeting, he advocated strenuously for restricting street performers from the boardwalk at the end of North Division Street, claiming that he would be willing to "give up" access to all of the other street ends in exchange for North Division Street. As Chief Larmore sees it, unrestricted access to the boardwalk via North Division Street is critical for public safety.

*3. Restrictions on the Manner of Peddling, Soliciting, Hawking, and Street Performing*

Restrictions on the manner in which a person may engage in peddling, soliciting, hawking, or street performing occupy the remainder of § 62-5(b) of the City Code:

**Sec. 62-5. — Prohibited acts on the boardwalk.**

\* \* \*

(b)     It shall be unlawful for any person engaging in the permitted activity of peddling, soliciting, hawking or street performing on the boardwalk to:

\* \* \*

(2)     Use anything other than portable tables or chairs for display purposes.

(3)     Set up any display on or within ten feet of tables, adjacent property entrance or exit, or boardwalk tram lane.

(4)     Obstruct or block pedestrian or vehicular traffic, the entrance to ramps and stairways to the beach, the entrance to comfort stations, the concrete pads on the east side of the boardwalk, public telephones, or trash receptacles.

\* \* \*

(6)     Violate the town's noise ordinances, after being warned by a police officer.

(7)     Connect to any municipal electric outlet or private electric outlet without the permission of the owner.

(8)     Use nudity, pornographic materials, or obscenity in any display or performance.

(9)     Conduct sales or exchanges as prohibited by section 62-4 hereof.

(10)    Set a price or fee or accept same for observing or participating in a display or performance, other than being a tip the amount of which is not solicited.

(11)    Handout or distribute any advertising or promotional material which promote an activity, product or service other than that which the peddler, solicitor, hawker or street performer is engaged in as an integral part of the display or performance.

(12)    Use animals, other than for legitimate ADA purposes, fire or other hazardous materials in a display or performance.

Some of the provisions of § 62-5(b) are difficult to reconcile with each other, especially as they relate to peddling and hawking. Notably, "peddling," "hawking," "soliciting," and "street performing" are not defined terms in the ordinance. The common meaning of peddling and hawking involves selling goods or services in public, often by means of loud advertising. *See, e.g.*, BLACK'S LAW DICTIONARY 786 (9th ed. 2009, Bryan A. Garner ed.) (defining hawking or peddling as the "act of offering, by outcry, goods for sale from door to door or on a public street"). Soliciting may also involve sales. *See id.* at 1520 (defining a "solicitor" as a "person who seeks business or contributions from others; an advertiser or promoter"). It is difficult to conceive how one can hawk or peddle, which § 62-5(b) indicates is a "permitted activity," without violating § 62-5(b)(9), which bans sales or exchanges, or § 62-5(b)(10), which bans the establishment of prices or fees and the receipt of compensation (other than tips in unsolicited amounts).

Mayor Meehan testified that Ocean City enacted § 62-5(b)(10) because the Mayor and City Council understood such a restriction to be the "standard practice" in other jurisdictions. He also indicated that the provision "discourages soliciting or hawking," and later suggested that,

because a price cannot be set under the ordinance, the solicitor or hawker must "have great faith in those that are purchasing" to pay fair prices (i.e., unsolicited tips).

<em>4. Licensing and Registration Provisions</em>

In addition to the foregoing regulations, Ocean City imposes city-wide, general business licensing requirements, as well as requirements for registration of "unlicensed solicitors."  Ocean City's general business licensing scheme is set forth in Chapter 14, Article II, of the City Code. Section 14-32 provides:

**Sec. 14-32. — License required.**

> No person shall engage in or carry on . . . in Ocean City, Maryland, any business, occupation or activity mentioned in [City Code, ch. 14, art. II] . . . without first having obtained from the Mayor and City Council of Ocean City a license for such business, occupation or activity.

Licenses must be renewed annually, upon payment of fees that are periodically established by resolution of the Mayor and City Council.  *See* City Code, § 14-34(a)-(b).  The general licensing ordinance also states that the "right is reserved to the Mayor and City Council to refuse to grant any license and to revoke any license previously granted which is determined by the Mayor and City Council to adversely affect the health, safety, morals and general welfare of the public."  *Id.* § 14-36.

Chapter 62 of the City Code, which imposes regulations applicable to the boardwalk, as set forth above, also contains requirements relevant to business licensure.  Section 62-1 provides:

**Sec. 62-1. — License required.**

> Except as herein provided, no persons shall engage in or carry on in Ocean City, Maryland, the business, occupation or activity of solicitor, distributor, peddler or hawker of any merchandise or commodity upon the streets or sidewalks of Ocean City, without first having obtained a license for such business,

occupation or activity as provided for in chapter 14, article II, Licensed Occupations.

Additionally, § 62-7(a) of the City Code states that the "provisions of chapter 14, article II of the Code of Ocean City, being general licensing provisions relating to business and trades, shall be applicable to all licenses under this article the same as if specifically set forth herein." Moreover, § 62-7(a) provides: "It shall be unlawful for any person, *licensed or unlicensed*, to hawk, peddle or solicit on any city street or public way, boardwalk, beach or any parking lot unless specifically exempted or excepted by chapter 14, article II or this chapter." *Id.* § 62-7(a) (emphasis added). It is a misdemeanor, subject to up to thirty days' imprisonment or a fine of up to $1,000, or both, to violate City Code § 62-7(a). *See id.* § 62-7(b).

Section 14-34(b) of the City Code specifies dozens of businesses, occupations, or activities that are subject to the licensing requirement, including, as relevant here, "[a]rt dealer and gallery," *id.* § 14-34(b)(2),[8] and "[h]awkers and peddlers, if permitted." *Id.* § 14-34(b)(35). Yet, § 14-34(b)(35) also states: "No licenses will be issued for hawking and peddling on any Ocean City street or public way, boardwalk, beach or any parking lot." Section 14-34(b) also contains a catch-all provision, which requires licensure of "[a]ny other business not herein classified or enumerated and not prohibited herein or by other provisions of this Code and approved by the Mayor and City Council." *Id.* § 14-34(b)(70).

As noted, Ocean City asserts that plaintiff is not subject to the business licensing requirements outlined above. *See* Opp. at 2-3. But, it maintains that Chase is subject to the registration requirement for "unlicensed solicitors," found in City Code, § 62-3, which states:

---

[8] The licensing requirement for an art dealer or gallery only authorizes sales in a building (or on a covered porch connected to a building). *See* City Code, § 14-34(b)(2).

**Sec. 62-3. — Registration of persons exempt from license requirement.**

(a)    (1)    The City Clerk shall, upon the making of the required oath and upon payment of the administrative fee, established by the Mayor and City Council, allow such person to register as an unlicensed solicitor and shall issue an identification tag or card to such person.[9]  The Clerk may waive the making of the oath and/or the administrative fee upon request supported by a valid reason.[10]  No person shall carry on such activity without first having obtained the permit required hereunder.

Although the City Code does not prescribe the amount of the registration fee, Ocean City states that the administrative fee for an "unlicensed solicitor" registration is currently seven dollars, which Mayor Meehan characterized as a "minimal cost" that merely "covers the administrative cost of issuing the permit."  According to Mayor Meehan, registration is valid for one year.

It is not clear from the City Code precisely who is "exempt from [the] license requirement," and thus subject to the requirement to register as an unlicensed solicitor.[11]  As noted, the City Code does not define the term "solicitor," and Chapter 14 of the Code, which

---

[9] It is not clear to whom "such person" refers, other than the "persons exempt from license requirement" mentioned in the caption of § 62-3.  Although the "caption of a statute . . . 'cannot undo or limit that which the [statute's] text makes plain,'" *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (citation omitted), the plain text of § 62-3 is not comprehensible without reference to its caption.

[10] I am not aware of any code provision that specifies the amount of the fee, the content of the oath, or what qualifies as a "valid reason" for waiver of the oath or fee requirement.

[11] A statutory restriction on speech may be unconstitutional because of impermissible vagueness regarding what persons or conduct are subject to the statute.  *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 304 (2008) (stating that a statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement").  Although the void-for-vagueness doctrine is "an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment," it has broader application "in the First Amendment context," where its requirements are "relaxed."  *Id.*  Chase has not challenged Ocean City's ordinances on vagueness grounds, however, and so I need not consider the void-for-vagueness doctrine here.

regulates business licensing, contains a catch-all provision requiring all businesses to obtain a license. *See* City Code, § 14-34(b)(70). At the hearing, the witnesses discussed the "unlicensed solicitor" registration requirement only in the context of street performers, and the parties agree that § 62-3 applies to street performers. Other provisions of the City Code, not cited by either party, indicate that the "unlicensed solicitor" registration requirement is not limited to street performers.

Ocean City's Pandhandling Ordinance, codified in Chapter 62, Article II of the City Code, generally bans "panhandling." Section 62-33 states: "It shall be unlawful for any person to panhandle by accosting another or forcing oneself upon the company of another within the corporate limits of Ocean City." Panhandling is defined in § 62-32 as follows:

> Any type of begging or accosting of others for money, services, food or any other objects; *solicitation of money, services, food or any other objects for which any service or object is offered in return, if the solicitor is not licensed by or registered with Ocean City and said license or registration identification tag is not publicly displayed at the time of said solicitation*; the harassment of citizens by persons attempting to entice or procure service, money, food or any other objects by the use of promises, threats, fraud or artifice; *or any peddling, soliciting, distributing or hawking in violation of the provisions of section 62-4*.

(Emphasis added).

But, § 62-34 of the City Code establishes an exception to the prohibition on panhandling:

**Sec. 62-34. — Exceptions.**

> The provisions of this article shall not apply to any person soliciting funds or contributions in pursuit of a religious or political activity, or for the purpose of supporting communications on religious, political or philosophical issues, and not for private profit or other purely commercial purpose, *provided that said person complies with the oath, registration and other requirements for unlicensed soliciting as provided for in sections 62-2 and 62-3*, and further provided that said persons solicit funds or contributions only in areas designated for unlicensed soliciting by the provisions of section 62-4. (Emphasis added.)

Thus, in addition to street performers such as plaintiff, it appears that the requirement to register as an "unlicensed solicitor" also applies, at a minimum, to persons who solicit "funds or contributions in pursuit of a religious or political activity, or for the purpose of supporting communications on religious, political or philosophical issues, and not for private profit or other purely commercial purpose." *Id.* On the other hand, it is also apparent that § 62-3 does not apply to "peddlers" or "hawkers," because § 14-34(b)(35) of the City Code requires hawkers and peddlers to obtain a business license, and therefore hawkers and peddlers are not "exempt from [the] license requirement," as mentioned in the caption of § 62-3.

According to Corporal Wawrzeniak and Mayor Meehan, the reason for the registration requirement is to ensure that City officials can identify who is performing on the boardwalk. Corporal Wawrzeniak indicated that, several years ago, an accusation was raised that a fully costumed performer had inappropriately touched a child. Both Corporal Wawrzeniak and Mayor Meehan testified that the registration requirement enables officials to ascertain the identities of costumed performers, in the event that a street performer is accused of improper conduct, and can also provide such performers with protection from false accusations.

Mayor Meehan testified that 550 registrations under City Code, § 62-3 were issued in 2010, and 396 registrations have been issued to date in 2011. The mayor did not make clear whether these figures represented only the street performers who registered, or the total number of registered "unlicensed solicitors."

<u>C. Plaintiff's Performance and Paintings</u>

Plaintiff is self-taught as a painter. Chase testified that he uses no brushes in his painting, relying entirely upon "paint manipulation" to achieve his desired effects. As he explained, he

- 15 -

puts his "heart and soul into every painting," and often incorporates into his paintings imagery representing the number three, which to him symbolizes the Christian Holy Trinity of Father, Son, and Holy Spirit. One of Chase's paintings was placed into evidence at the hearing. Chase plays music during his painting for inspiration, and to set a "tempo" for his work.

Chase has performed and created paintings on the Ocean City boardwalk since June 2010. According to Corporal Wawrzeniak, Chase is the only spray paint artist regularly working on the boardwalk. Because Chase's spray paints dry quickly, most of his paintings are completed in fifteen minutes or less, and his audience is able to watch his work develop from start to finish. *See* Ex.A to Motion, ¶ 4 ("Chase Aff.") (ECF 2-1). Chase markets and sells his paintings under the trade name "Stellar Paintings." *Id.* ¶ 3. At the hearing, plaintiff's counsel informed the Court that plaintiff has not registered as an unlicensed solicitor under § 62-3 of the City Code.

Plaintiff sets up his performance area "with an assortment of spray paints, indoor/outdoor carpets to protect the ground, a small ultra quiet portable generator, two heavy duty extension cords that plug into a surge protector, three work lights and various other painting supplies that are stored in plastic totes when not in use." *Id.* ¶ 8. Chase elevates his canvas a few feet from the ground, and generally paints on his knees. He sets up bright lights when he paints at night, which help him accurately see the colors of the paint as he works, and also make him more visible to passing pedestrians, so as to attract an audience.

According to Chase, his performance area occupies approximately an eight-by-twelve-foot footprint; he always sets up at least thirty feet from the path of the tram; and he makes sure his audience does not encroach on the tram. Chase's audiences vary in size, but because Chase

paints low to the ground, the crowd is ordinarily no more than two to three people deep—beyond

that distance, it would be difficult to see Chase in action.  He also establishes a barrier to keep

the audience three or four feet from his workspace.  In addition, because he uses aerosol paint,

and paints in close proximity to his canvas for hours at a time, Chase wears a partial face mask

while he paints, in order to avoid inhaling paint fumes (which Chase believes could cause "brain

damage").  Corporal Wawrzeniak testified that, in his experience, only one or two other frequent

street performers have a larger footprint than Chase.

Plaintiff's income derives from sales of his paintings.  Although Chase has established a

standard price of $40 per painting, he is willing to accept lower prices on occasion.  Chase used

to advertise the $40 price of his paintings with a printed sign, but stopped doing so after an

incident on May 7, 2011, when Ocean City police officers told him that, under City ordinances,

he must remove the sign, and that he may not orally inform audience members of the price of his

paintings.  Chase Aff. ¶¶ 12-14.

Chase also employs an assistant, who is compensated with the tips that Chase receives

from the audience.  The tips are deposited into two large buckets placed near Chase's

performance space.  The assistant, who is also learning the craft of artistic spray painting from

Chase, talks to the crowd, answers their questions, and conducts sales while Chase paints.

Until the recent enactment of Ordinance 2011-23, discussed *supra*, Chase ordinarily set

up his performance area on the boardwalk at the end of North Division Street.  Following the

enactment of Ordinance 2011-23, however, Chase was told by Ocean City police officers that he

may not set up his performance area at the end of North Division Street.  In his affidavit, Chase

also recounts an incident in which he was instructed not to perform in an area "across from the

Ripley's Believe It or Not Museum near the terminus of Wicomico Street." Chase Aff. ¶ 17.

At the hearing, Chase testified that, since these events, he has generally performed in the street end of Caroline Street, which is one block south of North Division Street. According to Chase, magicians used to perform at Caroline Street, but there is a "Dance Dance Revolution" video game machine that plays loud music near the location. The City had set up several benches in the street end in an amphitheatre-like formation when magicians were performing there, but the magicians ultimately found the area unsuitable for their performances, because they could not easily be heard above the music from the video game machine. Chase, who had been performing at other locations on the boardwalk since the enactment of Ordinance 2011-23, agreed to trade places with the magicians.[12] He does not mind the video game machine, because its music is similar to the music he plays to accompany his painting.

However, Chase testified that, for other reasons, the Caroline Street street end is not optimal for his performances. Since he began performing at Caroline Street, the City reconfigured the benches from their previous amphitheatre configuration, and bolted them in place. Chase explained that the benches are now configured in such a way that the view of Chase's performance area is obstructed from the boardwalk.[13] Thus, it is difficult to "pull people off of the boardwalk" and attract a crowd during daylight hours. According to Chase, he is more

---

[12] Ocean City does not assign locations to street performers, and so the performance locations are effectively available on a "first come, first served" basis. However, both Chase and Mayor Meehan testified that street performers make informal arrangements among themselves for performance locations, such as the "trade" described above.

[13] Mayor Meehan testified that the benches were reconfigured and bolted in place in order to ensure that patrons of an ice cream shop at the end of Caroline Street could sit on the benches to eat their ice cream. According to Mayor Meehan, people have sat and eaten ice cream on the benches for as long as he can remember, and the amphitheatre configuration was interfering with the benches' availability for use by patrons of the ice cream shop.

successful at night, when his lights advertise his presence.  (There are more people on the boardwalk at night, but there are still significant crowds in the afternoon.)  Chase would prefer to perform from noon to midnight, and did so when he performed at North Division Street, but he claimed that it is not feasible to perform during the daytime at Caroline Street because of the difficulty attracting an audience.  Moreover, the Caroline Street end is situated between an ice cream shop and another food vendor, and Chase testified that there are often significant amounts of trash in the street end, which can sometimes be carried by the wind and blown into a painting in progress, which obviously ruins it.  Chase did not explain why, given his concerns about Caroline Street, he has not moved to another street end.

Additional facts will be included in the discussion.

## Discussion

Plaintiff's challenge to Ocean City's statutory scheme arises under the guarantees of freedom of speech contained in the First Amendment to the United States Constitution and its State-law counterpart, Article 40 of Maryland's Declaration of Rights.[14]  "The threshold question

---

[14] The First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Article 40 of the Maryland Declaration of Rights provides: "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

The Maryland Court of Appeals has held that courts ordinarily "need not consider Article 40 and the First Amendment separately as Article 40 is read generally *in pari materia* with the First Amendment."  *Nefedro v. Montgomery County*, 414 Md. 585, 593 n.5, 996 A.2d 850, 855 n.5 (2010).  Plaintiff does not assert that the protection under Article 40 exceeds that of the First Amendment.  *See* Mem. in Support of Mot. for Prelim. Inj. at 7 n.4 (ECF 2-4).  Accordingly, I will consider the parties' claims in the context of well-established First Amendment case law.

in any First Amendment challenge, of course, is whether any protected First Amendment right is involved." *Willis v. Town of Marshall*, 426 F.3d 251 (4th Cir. 2005). Notably, "[i]t goes without saying that artistic expression lies within . . . First Amendment protection." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602 (1998). Plaintiff's public performance of painting, and his paintings themselves, are clearly protected speech under the First Amendment, and Ocean City does not argue otherwise. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 569 (1995) (remarking that even the abstract paintings of Jackson Pollock are "unquestionably shielded" by the First Amendment); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 389 (4th Cir. 1993) ("First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected.").

Moreover, the fact that plaintiff sells his paintings, or receives compensation for performing, does not remove his artistic expression from the ambit of the First Amendment. The "degree of First Amendment protection is not diminished merely because the . . . speech is sold rather than given away." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n.5 (1988); *see also Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.").

For the purpose of analyzing restrictions of speech on public property, the Supreme Court has divided such property into various categories: the traditional public forum, the designated public forum, the limited public forum, and the non-public forum. *See Christian Legal Society v. Martinez*, ___ U.S. ___, 130 S. Ct. 2971, 2984 n.11 (2010); *Perry Ed. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 46 (1983). Public streets and parks are the "archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). Indeed, they occupy a "'special position in terms of First Amendment protection,'" because "'[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate." *Snyder v. Phelps*, ___ U.S. ___, 131 S. Ct. 1207, 1218 (2011) (citations and some internal quotation marks omitted). Notably, "[i]n the traditional public forum, which includes the streets, sidewalks, parks, and general meeting halls, speakers' rights are at their apex." *Steinburg v. Chesterfield County Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008).

Chase contends, and Ocean City does not dispute, that the Ocean City boardwalk is a traditional public forum. *See* Mem. at 9-10; Opp. at 11.[15] Chase's position is consistent with several appellate decisions that have determined that a boardwalk or similar area is a traditional public forum. *See, e.g.*, *Perry v. Los Angeles Police Dept.*, 121 F.3d 1365, 1368-69 (9th Cir. 1997) (holding that the Venice Beach Boardwalk is a traditional public forum), *cert. denied*, 523 U.S. 1047 (1998); *ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1100-06 (2003) (holding that the "Fremont Street Experience," a publicly-owned commercial and entertainment pedestrian district in downtown Las Vegas, is a traditional public forum), *cert. denied*, 540 U.S. 1110 (2004); *Warren v. Fairfax County*, 196 F.3d 186, 189-90 (4th Cir. 1999) (holding that the "Center Island mall" in front of the Fairfax County Government Center Complex is a traditional public forum); *Gaudiya Vaishnava Soc'y v. City of San Francisco*, 952 F.2d 1059, 1061-65 (9th

---

[15] In a previous, unreported decision in this district considering a First Amendment challenge to earlier Ocean City ordinances restricting activity on the boardwalk, Judge Marvin J. Garbis rejected Ocean City's argument that the boardwalk is not a public street for First Amendment purposes. *See One World One Family Now, Inc. v. Mayor of Ocean City*, Civ. No. MJG-95-1401, op. at 9-11 (D. Md. June 22, 1995).

Cir. 1990) (holding that San Francisco's Fisherman's Wharf is a traditional public forum), *cert. denied*, 504 U.S. 914 (1992).[16]  Accordingly, I am readily satisfied that the boardwalk constitutes a traditional public forum.

In a traditional public forum, "'any restriction based on the content . . . of speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest.'"  *Christian Legal Society*, *supra*, 130 S. Ct. at 2984 n.11 (quoting *Pleasant Grove City v. Summum*, ___ U.S. ___, 129 S. Ct. 1125, 1132 (2009)) (alteration in original).  However, even in a traditional public forum, the government may impose reasonable "time, place, and manner" restrictions on speech, provided that the restrictions satisfy an intermediate level of scrutiny (rather than the uncompromising threshold of strict scrutiny).  In order to pass intermediate scrutiny, a "time, place, and manner" restriction on speech must (1) be "justified without reference to the content of the regulated speech"; (2) be "narrowly tailored to serve a significant governmental interest"; and (3) "leave open ample alternative channels for communication of the information" that the speaker wishes to communicate.  *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see also Pleasant Grove*, 129 S. Ct. at 1132; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests," and the

---

[16] Some decisions have held that certain publicly-owned tourist areas are not traditional public fora.  *See, e.g.*, *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 22-23 (1st Cir. 2002) (holding that Boston's Fish Pier is not a traditional public forum); *Chicago ACORN v. Metropolitan Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir. 1998) (holding that Chicago's Navy Pier is not a traditional public forum).  However, the tourist areas in those cases had attributes not shared by Ocean City's boardwalk.  For instance, historically they had not been public streets, and were not avenues of pedestrian travel.

regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," it "need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Rock Against Racism*, 491 U.S. at 799 (internal citations and footnote omitted). In other words, "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

These principles frame the analysis of plaintiff's motion for a preliminary injunction.

"In order to receive a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 374 (2008)); *see also Dewhurst v. Century Aluminum Co.*, ___ F.3d ___, No. 10-1759, slip op. at 4 (4th Cir. Aug. 22, 2011) (same). "[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *Musgrave*, 553 F.3d at 298 (citation omitted). As the Fourth Circuit said in *Legend Night Club v. Miller*, 637 F.3d 291 (2011), albeit in the context of permanent injunctive relief, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.*

at 302 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Ordinarily, such a threatened injury to plaintiff will "easily outweigh[] whatever burden the injunction may impose," because the government "is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Id.* at 302-03.

Thus, for the purpose of plaintiff's motion for preliminary injunction, I shall focus primarily on whether plaintiff can demonstrate a likelihood of success on the merits. As I explain below, because Ocean City's ordinances impose restrictions on speech and/or expressive conduct, which are subject at least to intermediate scrutiny, the City bears the burden of persuasion as to this issue.

Plaintiff argues that the disputed Ocean City ordinances are content-based restrictions on speech, because they apply "only to certain kinds of speech: peddling, soliciting, hawking and street performing, each of which involves speech that seeks to engage in some commercial exchange or receipt from the public." Mem. at 11. Therefore, plaintiff contends that the ordinances are subject to strict scrutiny. But, even if Ocean City's ordinances are content-neutral "time, place, and manner" restrictions, subject only to intermediate scrutiny, plaintiff maintains that they cannot satisfy that level of scrutiny.

Ocean City counters that its ordinances regulate conduct, not the content of expression. *See* Opp. at 5. According to the City, its ordinances are reasonable "time, place, and manner" restrictions, which satisfy the intermediate scrutiny standard. *See* Opp. at 10.[17]

_____

[17] Ocean City also argues that the Court should apply a somewhat different intermediate scrutiny test, which pertains to statutes that apply where "'speech' and 'nonspeech' elements are combined in the same course of conduct." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Under the *O'Brien* test, a restriction on such expressive conduct satisfies the First Amendment (1) "if it is within the constitutional power of the Government;" (2) "if it furthers an important or

- 24 -

Assuming, *arguendo*, that Ocean City's ordinances are content-based, and therefore subject to strict scrutiny, the Supreme Court has expressly held that the burden is on the government at the preliminary injunction stage to demonstrate the constitutionality of such an ordinance. In *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004), reviewing a preliminary injunction against enforcement of the content-based Child Online Protection Act ("COPA"), the Court said: "When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute." The Court explained that the Government must carry the burden not only at the final merits stage, but also at the preliminary injunction stage, stating: "As the Government bears the burden of proof on the ultimate question of COPA's constitutionality, respondents must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than COPA." *Id.* at 666. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006), the Court reiterated that "the burdens at the preliminary injunction stage track the burdens at trial."

In the alternative, assuming that the intermediate scrutiny standard applies, the burden of persuasion remains on the City. Although I am unaware of a case in which the Supreme Court or the Fourth Circuit has addressed the burden of persuasion at the preliminary injunction stage with respect to intermediate scrutiny under the First Amendment, appellate courts have

---

substantial governmental interest;" (3) "if the governmental interest is unrelated to the suppression of free expression;" and (4) "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377. Ocean City's distinction is essentially academic, however, because both *Clark, supra,* 468 U.S. 288, and *O'Brien* apply intermediate scrutiny. Indeed, as the Supreme Court explained in *Clark,* the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark,* 468 U.S. at 298. *Accord Hoffman v. State of Maryland,* 928 F.2d 646, 648 (4th Cir. 1991) (equating *O'Brien* and *Clark* standards).

concluded that, in general, the government bears the burden to satisfy intermediate scrutiny. In *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996), applying intermediate scrutiny to a restriction on commercial speech, the Supreme Court said that "the State bears the burden of showing … that its regulation will advance its interest … 'to a material degree.'" Similarly, applying intermediate scrutiny to a time, place, and manner restriction on street performance, the First Circuit said in *Casey v. City of Newport*, 308 F.3d 106, 111 (1st Cir. 2002): "The burden of proof is on the City to demonstrate that its restrictions on speech are narrowly tailored." Likewise, the Seventh Circuit has said that "'the government has the burden of showing that there is evidence supporting its proffered justification' for its speech restriction when asserting that the restriction survives the time, place, and manner analysis." *Horina v. City of Granite City*, 538 F.3d 624, 633 (7th Cir. 2008) (citation omitted). *Cf. Johnson v. Whitehead*, 647 F.3d 120, 135 (4th Cir. 2011) (stating, in challenge to naturalization statute under equal protection clause of Fifth Amendment, that "'intermediate scrutiny places the burden of establishing the required fit [of substantial relationship to an important government interest] squarely upon the government'") (quoting *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny in Second Amendment challenge)).

Based on the foregoing, I conclude that the burden of persuasion is on Ocean City. In effect, if the City cannot demonstrate that its ordinances satisfy the requisite level of scrutiny, plaintiff is likely to succeed on the merits.

Accordingly, I turn to consider each of the challenged ordinances.

<u>A.  Restriction on Location</u>

As indicated, § 62-5(b)(1) of the City Code, as amended by Ordinance 2011-23, restricts the "permitted activities" of hawking, peddling, soliciting, and street performing on the boardwalk to the "area encompassed in the extended boundaries of the street ends," but excluding the street end of North Division Street.  In my view, this restriction is a reasonable time, place, and manner restriction that is subject to, and satisfies, intermediate scrutiny.

At the outset, I reject plaintiff's contention that § 62-5(b)(1) is subject to strict scrutiny, as a content-based restriction on speech.  As noted, plaintiff contends that the ordinance is content based because it applies only to "peddling, soliciting, hawking or street performing," and not to other varieties of speech or expressive conduct.  In support of this contention, plaintiff cites *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), in which the Supreme Court struck down a Cincinnati ordinance prohibiting the public distribution of "commercial handbills." The plaintiffs in *Discovery Network* distributed free magazines consisting primarily of advertising material through various newsracks located throughout the city.  *Id.* at 412-13.  The city directed the plaintiffs to remove their newsracks, because their publications were prohibited as "commercial handbills" under an applicable city ordinance.  *Id.* at 413.  However, the ordinance did not prohibit the public distribution of newspapers, which were widely distributed via newsracks similar to those operated by the plaintiffs.  *Id.* at 419-20. In other words, the ordinance banned "the use of newsracks that distribute 'commercial handbills,' but not 'newspapers.'"  *Id.* at 429.  In holding the city's ordinance unconstitutional, the Court said: "Under the city's newsrack policy, whether any particular newsrack falls within the ban is

determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" *Id.*

Unlike the Cincinnati ordinance in *Discovery Network*, § 62-5(b)(1) does not differentiate between commercial and non-commercial speech. The location restriction applies to *all* peddling, hawking, soliciting, or street performing, regardless of what is being peddled or hawked; regardless of whether the solicitation is commercial or non-commercial in nature; and regardless of the ideas communicated. Put another way, the Ocean City ordinance is indifferent to the viewpoint of the speaker and to the subject matter of the speech or expressive conduct at issue. Thus, § 62-5(b)(1) does not implicate the core concern underlying strict scrutiny of content-based regulations, which is that government "'may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)).

Notably, the Supreme Court has consistently said that a statute will be considered content neutral so long as it is "'*justified* without reference to the content of the regulated speech.'" *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (citation omitted; emphasis in *Renton*). In other words, strict scrutiny is reserved for statutes that are "enacted for the purpose of restraining speech on the basis of its content." *Id.* at 46-47. As the Court made clear in *Renton*, an ordinance that applies to a particular type of speech or expressive conduct (in that case, the screening of adult movies) will be considered content neutral so long as it is "aimed not at the *content*" of the speech, "but rather at the *secondary effects* . . . on the surrounding community" of the regulated type of speech. *Id.* at 47 (emphasis in original). *See also Boos v.*

*Barry*, 485 U.S. 312, 320-21 (1988) (subjecting to strict scrutiny a D.C. ordinance prohibiting display of signs critical of foreign nation's government within 500 feet of that nation's embassy, and explaining that "[l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*").

In *Discovery Network*, Cincinnati's sin was not simply that it differentiated between commercial and non-commercial speech.[18]   Rather, the ordinance was content-based, and therefore constitutionally suspect, "because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech." *Discovery Network*, 507 U.S. at 429.   There were "no secondary effects attributable to [the plaintiffs'] newsracks that distinguish[ed] them from the newsracks Cincinnati permits to remain on its sidewalks." *Id.* at 430.   It was "the absence of a neutral justification for its selective ban on newsracks that prevent[ed] the city from defending its newsrack policy as content neutral." *Id.*

In this case, there is no connection between Ocean City's justification for its restriction of locations on the boardwalk where a person may peddle, hawk, solicit, or perform and the content of the speech.   Rather, as the City's witnesses credibly testified, the ordinance was enacted due to concerns for public safety and the management of the free flow of pedestrian traffic on the

---

[18] Indeed, the Supreme Court has consistently held that the Constitution "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 64-65 (1983). *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, ___ U.S. ___, 130 S. Ct. 1324, 133 (2010) (subjecting regulation of commercial speech to intermediate scrutiny); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) (same); *Central Hudson Gas & Elec. Co. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) (same).   Notably, expression is not "commercial speech" merely because the expression is sold.   Rather, the Supreme Court has described "commercial speech" as speech that has *all* of the following attributes: (1) it consists of "advertisements"; (2) it refers "to a specific product"; and (3) the speaker "has an economic motivation" for the speech. *Bolger*, 463 U.S. at 67.

boardwalk. Ocean City's witnesses addressed the traffic and safety issues presented by stationary crowds that tend to gather around street performers, regardless of the content of any given street performance, and the importance of vehicular access to the boardwalk via North Division Street. As Corporal Wawrzeniak testified, for example, the boardwalk is often highly congested, and the free flow of traffic is a significant concern for public safety. With respect to the recently-enacted North Division Street restriction, Chief Larmore thoroughly explained that, for public safety reasons, the City sought to bar street performers from the street end of North Division Street so as not to obstruct the access of emergency vehicles to the boardwalk.

I conclude that § 62-5(b)(1), including its recent amendment by Ordinance 2011-23, is a content neutral restriction on the time, place, and manner of speech, and is justified by Ocean City's substantial interests in public safety and the free flow of pedestrian traffic. Moreover, on the record presently before the Court, § 62-5(b)(1) appears narrowly tailored to those interests. By limiting peddling, hawking, soliciting, and street performing to the parts of the boardwalk that are within the "extended boundaries of the street ends," the ordinance ensures that those activities occur at the boardwalk's intersections with other city streets, where congested traffic has sufficient room to maneuver around stationary crowds. Furthermore, the restriction on North Division Street applies only to a single street end, because that particular street end is the only one large enough to accommodate the City's emergency equipment in the event of a fire or medical incident on the beach or boardwalk.[19]

_____

[19] In Chase's affidavit, and at the hearing, Chase presented some evidence that could be seen as undercutting the City's asserted reasons for the North Division Street restriction. For example, he noted that the City allows "Radio Free Disney" to erect a semi-permanent stage for performances on the beach at the street end of North Division Street. However, at this juncture, Chase has not marshaled these inchoate facts into any showing that the City's stated interests in

In sum, the City has demonstrated that § 62-5(b)(1) "promotes a substantial government interest that would be achieved less effectively" without the ordinance, *Rock Against Racism*, *supra*, 491 U.S. at 782-83, while not burdening "substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799. That is all that is required under the narrow tailoring prong of intermediate scrutiny.

Finally, it is clear that § 62-5(b)(1) leaves ample alternative avenues for plaintiff's expression. Plaintiff, along with other peddlers, solicitors, and street performers, is able to ply his craft at dozens of locations along the boardwalk, in any street end other than North Division Street. To be sure, plaintiff has articulated why he regards the end of Caroline Street as less optimal for his performances than the end of North Division Street. But, plaintiff's dissatisfaction with Caroline Street—one block from North Division Street—does not establish that Caroline Street, or the dozens of other available street ends, are constitutionally inadequate alternative channels for his expression.

Indeed, under Ocean City's ordinance, far more alternative forums for expression are available than was the case in *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981). In *Heffron*, the Supreme Court held that a Minnesota State Fair regulation, which required all sales and solicitation at the fair to be conducted from booths "rented to all comers in a nondiscriminatory fashion on a first-come, first-served basis," was a reasonable time, place, and manner restriction. *Id.* at 644. The Court stated that the booth rule was narrowly tailored to the state's legitimate "need to maintain the orderly movement of the crowd given the

---

crowd control and public safety are pretextual or that the North Division Street restriction is not narrowly tailored to those interests. At this stage of the litigation, on the basis of the evidentiary presentation at the preliminary injunction hearing, I am satisfied that § 62-5(b)(1) comports with the narrow tailoring prong of the intermediate scrutiny test.

large number of exhibitors and persons attending the Fair." *Id.* at 649-50. Moreover, because the fair made booths available for conducting solicitation and sales, the Court held that "alternative forums for the expression of respondents' protected speech exist despite the effects of the Rule." *Id.* at 654.[20]

Therefore, based on the evidence presently before the Court, I am satisfied that § 62-5(b)(1) satisfies intermediate scrutiny, and is a reasonable restriction on the time, place, and manner of speech. Accordingly, I decline to preliminarily enjoin enforcement of § 62-5(b)(1).

It is also clear that several other provisions of § 62-5(b) are constitutional under an intermediate scrutiny analysis. Indeed, plaintiff has not presented any argument for the unconstitutionality of several of § 62-5(b)'s subsections. The following provisions of § 62-5(b) are plainly content neutral and narrowly tailored to the City's interests in public safety or other substantial interests that are obvious on the face of the ordinance, and will not be enjoined:

> It shall be unlawful for any person engaging in the permitted activity of peddling, soliciting, hawking or street performing on the boardwalk to:
> * * *
> (3) Set up any display on or within ten feet of tables, adjacent property entrance or exit, or boardwalk tram lane.
> (4) Obstruct or block pedestrian or vehicular traffic, the entrance to ramps and stairways to the beach, the entrance to comfort stations, the concrete pads on the east side of the boardwalk, public telephones, or trash receptacles.
> * * *
> (6) Violate the town's noise ordinances, after being warned by a police officer.
> (7) Connect to any municipal electric outlet or private electric outlet without the permission of the owner.

---

[20] Notably, *Heffron* expressly overruled a contrary Fourth Circuit decision, *Edwards v. Maryland State Fair & Agricultural Society, Inc.*, 628 F.2d 282 (4th Cir. 1980), cited by plaintiff, which invalidated a similar "booth rule" for the Maryland State Fair. *See Heffron*, 452 U.S. at 646 n.9 (listing *Edwards* among conflicting lower court cases supporting grant of certiorari).

*   *   *

(12) Use animals, other than for legitimate ADA purposes, fire or other hazardous materials in a display or performance.

Section 62-5(b)(8) prohibits the use of "nudity" and "pornographic materials" in any "display or performance." Plaintiff has not mounted any argument or presented any evidence with respect to this provision.[21]  Nor has plaintiff suggested that he utilizes or seeks to utilize depictions of nudity or pornographic content in his own work.

Federal courts do not have "'unconditioned authority to determine the constitutionality of legislative or executive acts,'" without regard to the constitutional and prudential requirements of standing.  *Arizona Christian Sch. Tuition Org. v. Winn*, ___ U.S. ___, 131 S. Ct. 1436, 1442 (2011); *see also Commonwealth of Virginia ex rel. Cuccinelli v. Sebelius*, ___ F.3d ___, No. 11-1057, slip op. at 20 (4th Cir. Sept. 8, 2011).   In order to challenge Ocean City's ordinances, plaintiff "must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions."  *Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) (rejecting First Amendment challenge to statutes that did not apply to plaintiffs); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-36 (1990) (same).   An "interest shared generally with the public at large in the proper application of the Constitution and laws" is insufficient to confer standing.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).   In the absence of standing, or any evidence or analysis, I will not enjoin § 62-5(b)(8).

---

[21] Section 62-5(b)(8) also prohibits the use of "obscenity," which is clearly constitutional because obscenity "enjoy[s] no First Amendment protection."  *United States v. Williams*, 553 U.S. 285, 298 (2008).

Similarly, I will not enjoin § 62-5(b)(11), which makes it unlawful to "[h]andout or distribute any advertising or promotional material which promote an activity, product or service other than that which the peddler, solicitor, hawker or street performer is engaged in as an integral part of the display or performance." As an express regulation of advertising, this provision appears to be a restriction on commercial speech, subject to intermediate scrutiny. *See* note 18, *supra*. Although plaintiff's counsel briefly commented on this provision in argument, the parties have not presented any evidence or detailed analysis regarding its operation or application. More important, plaintiff's counsel expressly conceded that § 62-5(b)(11) "doesn't affect Mr. Chase." Accordingly, I decline to enjoin § 62-5(b)(11).

I also will not enjoin § 62-5(b)(2), which prohibits the use of "anything other than portable tables or chairs for display purposes." Although plaintiff's counsel suggested in argument that this provision could impinge upon free expression by prohibiting the use of "props," that interpretation is by no means clear on the face of the ordinance. Nor was any evidence was offered regarding the enforcement of this provision, its application to plaintiff, or the governmental interests it serves. Without such evidence, there is no showing at this juncture that plaintiff, or anyone else, is likely to be harmed by its continued enforcement.

The City ordinances that prohibit "sales or exchanges," § 62-5(b)(9), and establishment or acceptance of "a price or fee . . . for observing or participating in a display or performance, other than . . . a tip the amount of which is not solicited," § 62-5(b)(10), along with the categorical ban on commercial activity, § 62-4, present thornier questions. I now turn to those provisions.

B. Restrictions on Commercial Expression and Activity

Section 62-5(b)(10), quoted above, plainly regulates speech. *See Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (holding that a regulation forbidding street performers to "'solicit donations,'" except by "'passively' . . . 'inform[ing] the public that such donations are sought'" with written signs, constituted a restriction on speech because it "*allows* the conduct—exchange of money," but "regulates only the speech by specifying the manner of requesting money—only . . . passively") (quoting regulation; emphasis in original). However, I must consider the provision in the context of §§ 62-2, 62-4, and 62-5(b)(9), which essentially ban all commercial activity on the boardwalk.

Primarily at issue is § 62-4, which prohibits on the entire boardwalk, as well as several adjoining and nearby areas, the "public sale, rental or exchange for a donation of any goods, wares, merchandise, foodstuffs, refreshments or other commodities or services." By its text, § 62-4 is not a restriction of speech. Rather, it is an economic regulation that prohibits the sale of any products or services in particular locations. Clearly, in the majority of its applications, the ordinance does not pose First Amendment issues. *See, e.g.*, *United States v. Antzoulatos*, 962 F.2d 720, 726 (7th Cir.) ("Regulation of economic activity, such as Antzoulatos' ability to sell cars, simply does not implicate the First Amendment."), *cert. denied*, 506 U.S. 919 (1992). Moreover, the fact that the ordinance necessarily prohibits a vendor from making the types of communications that are inherent in any sale of a product (e.g., advertising, communicating a price, etc.) does not subject it to First Amendment scrutiny. The Supreme Court has said: "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is

altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973).

However, courts have recognized that a restriction on sales in a traditional public forum can raise First Amendment concerns when applied to the sale of expressive material that is entitled to First Amendment protection. For instance, in *Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996), *cert. denied*, 520 U.S. 1251 (1997), and *Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006), the Second Circuit considered First Amendment challenges to the enforcement of New York City's General Vendors Law, which governs street vending, against artists selling their own "painting, photography and sculpture," *Bery*, 97 F.3d at 691, and "freelance artists" selling "clothing painted with graffiti," *Mastrovincenzo*, 435 F.3d at 82. Similarly, a series of cases in the Ninth Circuit addressed the constitutionality of restrictions on vending in traditional public fora, as applied to "nonprofit groups" selling "message-bearing . . . merchandise such as T-shirts, books, buttons, stuffed animals, jewelry and bumper stickers," *Gaudiya Vaishnava Soc'y v. City of San Francisco*, 952 F.2d 1059, 1060 (9th Cir. 1990), *cert. denied*, 504 U.S. 914 (1992); the sale by non-profit organizations of "T-shirts imprinted with various philosophical messages," *One World One Family Now v. City of Honolulu*, 76 F.3d 1009, 1011 (9th Cir.), *cert. denied*, 519 U.S. 1009 (1996); a street musician's sale of his recorded music and sale by an "activist" of "literature, books, t-shirts, bumper stickers, buttons, and other articles bearing political slogans," *Perry v. Los Angeles Police Dept.*, 121 F.3d 1365, 1366-67 (9th Cir. 1997), *cert. denied*, 523 U.S. 1047 (1998); a "painter of nature scenes" selling his paintings, *White v. City of Sparks*, 500 F.3d 953, 954 (9th Cir. 2007), *cert. denied*, 553 U.S. 1005

(2008); and vendors of shea butter and incense, *see Hunt v. City of Los Angeles*, 638 F.3d 703,708 (9th Cir. 2011).[22]

The cases cited above have come to different conclusions as to the constitutionality of the various statutes they considered, as applied to the particular vendors in each case. But, the courts generally shared a common methodology. Initially, they looked to whether the plaintiff's sale of the particular type of merchandise at issue constituted protected expression under the First Amendment. *Compare, e.g.*, *White*, 500 F.3d at 956 (holding "that the First Amendment protects an artist's original paintings" and that plaintiff's "sale of his paintings" did not "remove[] them from the ambit of protected expression") *with Hunt*, 638 F.3d at 716-17 (holding that plaintiffs' sale of shea butter and incense was not "fully protected speech" because they "are selling items that have a predominantly utilitarian, not an expressive, purpose and do not incorporate artwork created by Plaintiffs").

This is not always an easy task, because there are "inherent line-drawing problems associated with distinguishing among artwork with presumptively expressive content (such as [paintings, photographs, prints, and sculptures]), merchandise with potentially expressive content (such as 'the crafts of the jeweler, the potter and the silversmith'), and merchandise with no expressive content." *Mastrovincenzo*, 435 F.3d at 85 (quoting and citing *Bery*, 97 F.3d at 696). Moreover, some objects are otherwise utilitarian, but can become "inextricably intertwined" with "pure elements of speech" when they are sold to disseminate political, religious, or philosophical messages, *Gaudiya*, 952 F.2d at 1064-65 (holding that religious and political groups' sale of

---

[22] I am unaware of a Supreme Court case or a Fourth Circuit case that has discussed the specific issue of application of the First Amendment to a wholesale restriction on sales, including the sale of protected expression, in a traditional public forum.

merchandise and literature was fully protected); *see also One World*, 76 F.3d at 1011-12 (holding that nonprofit corporations' sales of "T-shirts imprinted with various philosophical messages" were "within the ambit of the First Amendment"), or when they "serve a predominantly expressive purpose." *Mastrovincenzo*, 435 F.3d at 97 (holding that artists' graffiti-painted clothing items "serve a predominantly expressive purpose and their sale is consequently protected under the First Amendment").

If a plaintiff's sale of merchandise constituted expression protected by the First Amendment, the courts then analyzed the particular commercial regulation in issue to determine whether it was content neutral, and, if so, whether it satisfied intermediate scrutiny. *See, e.g.*, *Mastrovincenzo*, 435 F.3d at 98 (applying intermediate scrutiny); *One World*, 76 F.3d at 1012 (same); *Perry*, 121 F.3d at 1369-71 (same).

Here, as I have already discussed, plaintiff's sale of his own artistic paintings and his public performances of painting are expressive conduct. Although other artisans or performers might pose more difficult "line-drawing problems" for distinguishing primarily expressive conduct from the sale of predominantly utilitarian items, *Mastrovincenzo*, 435 F.3d at 85, Chase's art and performance clearly constitute fully protected expression, and his sale of his own paintings is also fully entitled to the protection of the First Amendment. The ordinance is obviously content neutral, however, in that it applies to all sales of any goods or services. *See One World*, 76 F.3d at 1012 ("The ordinance imposes a flat ban, one that is applied without regard to content. Accordingly, it is content-neutral."). Accordingly, I turn to the second stage of analysis, and consider whether § 62-4 of the City Code, as applied to plaintiff, satisfies intermediate scrutiny. As discussed, to satisfy intermediate scrutiny, the City must demonstrate

that the ordinance is narrowly tailored to serve a significant government interest, and leaves open an adequate alternative channel of communication. In my view, the City has failed to do so.

The City's attorney conceded at the preliminary injunction hearing that the prohibition on sales is "the weakest part of the entire ordinance." The only interest served by § 62-4 that the City identified was to "prohibit pure commerce on the boardwalk." That is not a statement of purpose so much as a description of the operation of the ordinance. In any event, if the purpose of § 62-4 is to render the boardwalk an area free of commercialism, it is not narrowly tailored to serve that interest; indeed, it is well known that Ocean City's boardwalk is host to a veritable bazaar of commercial activity from the shops and attractions that line it. Yet, § 62-4 prohibits commerce only by persons situated on the boardwalk itself, who do not sell their wares from "brick-and-mortar" establishments.

Although the City did not articulate other any other interests served by § 62-4, municipalities in other cases have cited additional interests supporting restrictions on commercial activity. For instance, in *One World*, the City of Honolulu articulated three "legitimate governmental interests" in support of an ordinance prohibiting the sale of merchandise on city streets: "(1) 'maintaining the aesthetic attractiveness of Waikiki,' (2) 'promoting public safety and the orderly movement of pedestrians,' and (3) 'protecting the local merchant economy.'" 76 F.3d at 1012. Even assuming that Ocean City had asserted these interests in support of § 62-4, no evidence was presented demonstrating that a total ban of the sale of merchandise on the boardwalk, including the sale of fully protected expression, is narrowly tailored to serve those interests.

As we have seen, Ocean City expressly permits peddling, hawking, soliciting, and street performing in designated locations on the boardwalk; the City has delineated those locations for the very purpose of promoting public safety and the free flow of traffic.  Yet, in these areas, tips may be collected.  Ocean City did not present any evidence explaining the rationale for allowing peddlers, hawkers, solicitors, or street performers to give away their work, without charge, or to collect tips, while barring the sale of expressive material in those same locations.  Put another way, Ocean City has not submitted any evidence as to why sales would affect the aesthetics of the boardwalk, or create greater public safety concerns, than would otherwise result from the collection of tips or free performances.  Nor has Ocean City introduced any evidence that § 62-4 is narrowly tailored to protect the City's local economy, such as the vendors who operate from stores along the boardwalk.

Finally, § 62-4 does not leave ample alternative avenues for plaintiff, and others similarly situated, to communicate their protected expression.  To the contrary, it is a total prohibition that applies to the entire boardwalk, as well as to all City streets within 75 feet of the boardwalk.  In *Heffron*, *supra*, the Supreme Court stressed that to satisfy intermediate scrutiny, a regulation of speech must provide alternative avenues for expression "within the forum in question."  452 U.S. at 655.  The Court has long maintained that "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'"  *Reno v. ACLU*, 521 U.S. 844, 880 (1997) (quoting *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939)).

For similar reasons, the First Circuit in *Bery*, *supra*, 97 F.3d at 697-98, held that New York City's General Vendors Law unconstitutionally restricted the First Amendment rights of

visual artists who sought to sell their paintings, photography, and sculpture on city streets. The *Bery* Court stated that, under intermediate scrutiny, New York City could not "bar an entire category of expression to accomplish [its] accepted objective [of keeping sidewalks free of congestion] when more narrowly drawn regulations will suffice." *Id.* at 697.

Turning to § 62-5(b)(10), which bars street performers from requesting or accepting compensation other than unsolicited tips, this restrictions plainly implicates speech, and fails intermediate scrutiny for reasons similar to those pertaining to § 62-4. At this juncture, the City has not articulated any legitimate government interest in support of this provision. Mayor Meehan merely expressed his belief that such a restriction is a "standard practice" in other jurisdictions. That alone is not a legitimate government interest sufficient to satisfy intermediate scrutiny.[23]

Because the City has failed to carry its burden of demonstrating that this particular provision satisfies intermediate scrutiny, I will preliminarily enjoin its enforcement. However, with respect to § 62-4, and its related provisions, §§ 62-2 and 62-5(9), there are many possible applications of the ordinances that do not raise First Amendment concerns. For example, there is no free speech concern as to a prohibition on the sale of items that have no expressive content and thus are not entitled to First Amendment protection.

"When some applications of a statute are constitutional, but others are not, the Supreme Court has explained that courts should strive, if feasible and consistent with the legislature's

---

[23] Because the City has not met its burden of justifying §§ 62-5(b)(10) under intermediate scrutiny, I need not determine whether the provision is a content-based restriction subject to strict scrutiny. I note, however, that the Ninth Circuit, sitting *en banc* in *Berger*, *supra*, 569 F.3d 1029, held that a "passive solicitation rule" quite similar to § 62-5(b)(10) of the City Code, applicable to street performers at a public park and tourist attraction, was a "content-based regulation" that did not satisfy strict scrutiny. *Id.* at 1050.

intent, 'to enjoin only the unconstitutional applications of a statute while leaving other applications in force.'" *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 257 (4th Cir. 2010) (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006)). In this case, no particular textual portion of § 62-4 is severable. Rather, what must be enjoined, if possible, is the statute's application to sales that constitute protected expression under the First Amendment. To be sure, this presents a "line-drawing problem," *Mastrovincenzo*, 435 F.3d at 85, which requires a court to consider whether the items that are sold "serve a predominantly expressive purpose," *id.* at 97, or, conversely, "have a predominantly utilitarian, not an expressive, purpose." *Hunt*, *supra*, 638 F.3d at 716. In some situations, this will require case-by-case adjudication.

In my view, it is possible to craft an injunction that will apply only to presumptively unconstitutional applications of Ocean City's sales ban. In *Hunt*, the Ninth Circuit upheld against First Amendment challenge a ban on boardwalk sales that contained an exemption tailored to protect expressive conduct. *See id.* at 714-17. Moreover, the *Hunt* Court determined that the exemption was not unconstitutionally vague, *id.* at 714, which is a virtue in an injunctive provision as well as a statute, for a federal court must frame its injunctions "so that those who must obey them will know what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local No. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

Therefore, I will adopt the standard considered in *Hunt* in enjoining the enforcement of §§ 62-2, 62-4, and 62-5(9) as applied to plaintiff or similarly situated persons engaged in protected expressive conduct. In particular, I will preliminarily enjoin the enforcement of §§ 62-2, 62-4, and 62-5(9), only as applied to the sale of items that have been created, written, or

composed by the vendor; are inherently communicative; and have only nominal utility apart from their communicative value.[24]

## C. Registration Requirement

Finally, I consider plaintiff's challenge to the requirement for registration of "unlicensed solicitors," established by City Code, § 62-3, and enforced by § 62-7. The Supreme Court has long been wary of laws "'subjecting the exercise of First Amendment freedoms to the prior restraint of a license,'" *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (citation omitted), and there is a "'heavy presumption'" against their validity. *Id.* at 130 (citation omitted). Nevertheless, such a law may pass constitutional muster so long as it is content neutral; does not apply to an overbroad "amount of speech," *Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165 (2002); strikes "an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve," *id.*; establishes clear criteria for the issuance of a license, such that whether a license is issued is not left to a government official's "boundless discretion," *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 764 (1988); and is ordinarily subject to procedural safeguards to ensure "that the licensor 'will, within a specified brief period, either issue a license or go to court'" to obtain a judicial determination of whether a license may be withheld. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 802 (1998) (citation omitted).

---

[24] The *Hunt* Court offered examples of items that meet the standard of being "'inherently communicative'" and having only "'nominal utility apart from . . . communication'" ("'books, cassette tapes, compact discs, digital video discs, paintings, photographs, [and] sculptures'") as well as items that do not meet the standard ("'housewares, appliances, articles of clothing, sunglasses, auto parts, oils, incense, perfume, lotions, candles, jewelry, toys, and stuffed animals'"). *Hunt*, 638 F.3d at 714 (quoting ordinance).

Ocean City's registration scheme is not content-based. Moreover, it does not appear that the registration requirement unconstitutionally vests unbridled discretion in an administrative official. To the contrary, from the plain text of § 62-3 and from Mayor Meehan's testimony, it appears that registration of an unlicensed solicitor is essentially a ministerial act, which the city clerk has no discretion to refuse. Although the ordinance contains no express provisions for procedural safeguards in the event of denial of registration, I assume, for the sake of argument, that this is not a constitutional impediment, given the apparently ministerial nature of the registration scheme and Mayor Meehan's testimony that, to his knowledge, a registration has never been denied.

The registration scheme founders, however, due to its overbreadth; it broadly restricts speech and fails to strike a balance between the speech affected and the governmental interests that Ocean City has asserted in support of the registration scheme. In my view, *Watchtower*, one of the Supreme Court's most recent discussions of the constitutional requirements that apply to permit requirements for speech, compels the conclusion that plaintiff is likely to prevail on the merits of his First Amendment challenge to Ocean City's registration ordinance.

In *Watchtower*, the Supreme Court considered a municipal "ordinance making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit." 536 U.S. at 153. Jehovah's Witnesses, who "did not apply for a permit," challenged the registration requirement, *id.* at 157, because "door-to-door canvassing is mandated by their religion," *id.* at 160, and, according to their beliefs, they "derive[d] their authority to preach from Scripture." *Id.* at 156-58. The ordinance at issue provided, *id.* at 154-55 nn. 1 & 2 (quoting ordinance):

No canvasser, solicitor, peddler, hawker, itinerant merchant or transient vendor of merchandise or services . . . who intends to go in or upon private property or a private residence in the Village for [the 'purpose of advertising, promoting, selling and/or explaining any product, service, organization or cause, or for the purpose of soliciting orders for the sale of goods, wares, merchandise or services'], shall go in or upon such private property or residence without first registering in the office of the Mayor and obtaining a Solicitation Permit.

The Supreme Court observed that the ordinance applied not only to "commercial activities and the solicitation of funds," but to "noncommercial 'canvassers' promoting a wide variety of 'causes,'" and "unquestionably" applied "not only to religious causes, but to political activity as well." *Id.* at 165. According to the Court, the "mere fact that the ordinance covers so much speech raises constitutional concerns." *Id.* It explained, *id.* at 165-66:

It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition.

The Court noted "[t]hree obvious examples" to illustrate the "pernicious effect" of such a broad permit requirement. *Id.* at 166. First, the "requirement that a canvasser must be identified in a permit application filed in the mayor's office and available for public inspection necessarily results in a surrender of . . . anonymity," despite case law recognizing the rights of the "significant number of persons who support causes anonymously." *Id.* Second, "requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens" whose "religious scruples will prevent them from applying for such a license" or "who have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to

speech licensed by a petty official." *Id.* at 167. Third, there was "a significant amount of spontaneous speech that is effectively banned by the ordinance," because a person's "decision on a holiday or a weekend to take an active part in a political campaign" or a "spontaneous decision to go across the street and urge a neighbor to vote against the mayor" would be subject to the permit requirement. *Id.*

The breadth of Ocean City's registration requirement for "unlicensed solicitors" is akin to the ordinance at issue in *Watchtower*. As in *Watchtower*, Ocean City's registration requirement applies to both commercial and non-commercial speech. Moreover, Ocean City expressly subjects religious and political solicitation, as well as street performers, to the registration requirement, in order to avoid the offense of panhandling. *See* § 62-34. Also like the *Watchtower* ordinance, Ocean City's registration requirement effectively prohibits anonymous or spontaneous speech, solicitation, and performance.

Although the *Watchtower* Court noted with disapproval the breadth of the ordinance before it, the Court also stated that the "breadth and unprecedented nature of this regulation does not alone render the ordinance invalid." *Watchtower*, 536 U.S. at 168. The Court explained: "Also central to our conclusion that the ordinance does not pass First Amendment scrutiny is that it is not tailored to the Village's stated interests." *Id.* In *Watchtower*, the Village of Stratton advanced three interests in support of its ordinance: "the prevention of fraud, the prevention of crime, and the protection of residents' privacy." *Id.* at 164-65. The Court had "no difficulty" concluding that these were "important interests," *id.* at 165, but determined that the ordinance was not tailored to advance any of them.[25]

---

[25] The *Watchtower* Court expressly declined to address the applicable degree of judicial

Here, the only interests that Ocean City has advanced in support of the registration requirement are the City's desires to protect children from potential inappropriate conduct by costumed street performers, whose identities would be hidden by the costumes, and to protect street performers from unfounded accusations of misconduct. These are clearly legitimate governmental interests. But, simply put, the ordinance is not narrowly tailored to achieve them. To the contrary, the registration requirement is vastly overinclusive with respect to the City's stated concerns about the anonymity of costumed performers. Rather than applying only to costumed performers, for example, the ordinance applies to all performers (regardless of whether they perform for children or in costume), as well as to religious or political solicitors who do not engage in street performance. Moreover, there is no indication that the registration requirement involves any precautions against predation on children (such as checking an applicant against a sex offender registry, or a criminal background check). Indeed, on its face, the ordinance does not even require an applicant to produce identification. Instead, it requires only that an applicant take an oath (which can be waived) and pay a nominal fee.[26]

Moreover, even if the City were to rely upon its interests in preventing congestion and ensuring the free flow of pedestrian traffic (which it has not expressly done), the registration

---

scrutiny, "because the breadth of speech affected by the ordinance and the nature of the regulation make it clear that the Court of Appeals erred in upholding it," regardless of the standard. *Watchtower*, 536 U.S. at 164.

[26] In another respect, the registration requirement is underinclusive. According to Mayor Meehan, the City receives millions of visitors in the summer months, and hundreds or even thousands are on the boardwalk on any given evening. Ocean City does not check identification or in any way restrict the entry of the general public onto the boardwalk. Any of the multitude of anonymous visitors to the boardwalk every evening could pose similar dangers to children, or could similarly be at risk of being falsely accused. Yet, Ocean City's ordinance obviously does not apply to them. The ordinance's simultaneous overinclusivity and underinclusivity is a hallmark of a regulation that is not narrowly tailored.

requirement is not tailored to serve those interests either. For instance, Ocean City's registration requirement does not designate a particular boardwalk location for each registered performer or solicitor, nor does it limit the total number of performers and solicitors who may be registered or who may operate on the boardwalk at any given time.

In short, based on the record presently before me, Ocean City's registration requirement for "unlicensed solicitors" does not satisfy First Amendment scrutiny under the Supreme Court's decision in *Watchtower*, because the ordinance is overbroad and insufficiently tailored to the legitimate interests that the City has articulated. Accordingly, plaintiff has established a likelihood of success on the merits as to the registration requirement, and I will preliminarily enjoin its enforcement. In order to effectuate this ruling, I must preliminarily enjoin both the registration requirement itself, which is contained in § 62-3, as well as the provision that bans solicitation and/or street performance by persons who have not registered, which is found in § 62-7.

### D. Security

Rule 65(c) of the Federal Rules of Civil Procedure requires that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Fourth Circuit has explained that this rule "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). Ordinarily, "failure to require a bond upon issuing injunctive relief is reversible error." *Id.* Although a court "is not free to disregard the bond requirement altogether," a court "has discretion to set the bond amount 'in such sum as the court deems proper.'" *Id.* (quoting rule).

Because Ocean City has consented to the waiver of the bond requirement (ECF 13), I will not impose a bond. In any event, I note that while the City will not be able to collect the seven dollar fee from registrants while § 62-3 is enjoined, Mayor Meehan testified that the nominal registration fee merely covers the administrative costs of the registration requirement. Because the registration requirement will be enjoined, the City will not incur those costs. *See Maryland Department of Human Resources v. United States Department of Agriculture*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (stating that district court has "discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm"); 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1954, at 293 (2d ed. 1995, April 2011 Supp.) (stating that a "court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant").

### E. Conclusion

For the foregoing reasons, I will grant in part, and deny in part, plaintiff's motion for a preliminary injunction. In particular, I conclude that, with respect to City Code, §§ 62-3 and 62-5(b)(10), plaintiff has established that he is likely to succeed on the merits of his First Amendment claim; that he is likely to be irreparably harmed in the absence of injunctive relief; and that the balance of equities and the public interest favor entry of an injunction. Accordingly, I will preliminarily enjoin enforcement of §§ 62-3 and 62-5(b)(10), pending the conclusion of this litigation or further order of the Court, as well as application of § 62-7 to persons who would be subject to the requirement to register as an "unlicensed solicitor" under § 62-3. Similarly, plaintiff is likely to succeed on the merits of his challenge to §§ 62-2, 62-4 and 62-5(b)(9), and I will preliminarily enjoin enforcement of those provisions, as applied to plaintiff and others

similarly situated.  Plaintiff has not demonstrated a likelihood of success on the merits as to the other challenged City ordinances.  Consequently, they will not be enjoined.

An Order and a Preliminary Injunction implementing the foregoing rulings follow.


Date:   September 9, 2011                          _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge